IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAWRENCE SCOTT,                          )
                                         )
                Petitioner,              )
                                         )
        v.                               )        No. 10 C 4954
                                         )
JESSE MONTGOMERY,                        )
                                         )
                Respondent.              )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On Oct. 29, 1996, Petitioner Lawrence Scott ("Scott") was convicted at a bench trial in the Circuit Court of Cook County of first-degree murder and aggravated discharge of a firearm in connection with the 1993 shooting of Michael Jones. Scott was subsequently sentenced to 35 years in prison, and is currently serving a term of mandatory supervised release. Before the court is Scott's "Petition for a Writ of Habeas Corpus" pursuant to 28 U.S.C. § 2254 (Dkt. No. 7 ("Petition").)

Scott timely filed this petition on Aug. 18, 2010, and it is not barred for failure to exhaust state court remedies. In his petition, he raises the following issues: (1) his trial counsel was ineffective for failing to interview Lawrence Jones, the victim's brother, and for stipulating to ballistics testimony by the state's expert; (2) that newly discovered evidence indicates that members of a rival gang framed Scott, and his post-conviction counsel failed to amend Scott's post-conviction petition to include this evidence; (3) that prosecutorial misconduct occurred when the prosecution mischaracterized the evidence and trial and the trial court repeated those misstatements in finding Scott guilty; (4) that his trial attorney was suspended from the practice

of law in 2008 for ineffective assistance and substance abuse that occurred near the time of Scott's trial. For the reasons stated herein, Scott's petition is denied.

BACKGROUND

1.    <u>Evidence at Trial</u>

The following facts are taken from the Illinois Appellate Court's ruling affirming Scott's conviction and sentence. (Dkt. No. 18, Ex. A (*People v. Scott*, No. 1–97–0186 (Ill. App. Ct. April 24, 1998) (unpublished order pursuant to Illinois Supreme Court Rule 23) ("Direct Appeal.").)

Woodrow Jones ("Woodrow"), the victim's uncle, testified as follows. At 4 p.m. on Jan. 5, 1993, Woodrow and his cousin, Johnnie Darty, were driving in Chicago near East 107th Street and Champlain Avenue when they saw Jones, Carlos Alcantar, and Janta Parsons. After the three men got into Woodrow's vehicle, a group of young women they knew ran across the street in front of them. Jones, Alcantar, and Parsons got out of the car and followed the women. Woodrow followed them in his car and parked alongside a building at 107th Street and Langley Avenue. Woodrow heard a commotion and saw Scott run out of the building with a young woman who tried to grab his arm. Scott walked to a green van nearby. Woodrow saw him enter the van on the driver's side, stand on a ramp on the van, and point a gun toward the people in front of the building. Woodrow heard gunshots, and Jones, Alcantar, and Parsons ran back to Woodrow's car. Woodrow heard the van back up and stop three to four inches from his car. The van was facing west and his car was facing east. Woodrow looked up, saw Scott with a gun, and told everyone to lie on the floor of the car. Woodrow heard two shots, and then heard the van

drive away. As Woodrow drove away, he noticed that his rear window was shattered and that Jones had been shot. Woodrow identified Scott as the shooter from a photo array.

On cross-examination, defense counsel asked Woodrow if he knew anyone affiliated with the Four Corner Hustlers street gang or if anyone in his car on the day of the shooting was affiliated with the gang. The trial court sustained the prosecutor's objection based on relevance.

The testimony of the prosecution's other witnesses was substantially similar to Woodrow's account. Alcantar, who was the victim's cousin, testified that he saw a group of people in front of the apartment building of Tamiko Richardson,[1] who had been Scott's girlfriend at the time of the shooting. Alcantar saw Scott leave the building and heard Scott say that someone had stolen his hubcaps. Scott then began to shoot at the crowd.

On cross-examination, defense counsel asked Alcantar if he was a member of the Four Corner Hustlers gang. The trial court overruled the prosecutor's objection to the question, and Alcantar denied being a member of the gang. Alcantar said the neighborhood where the shooting occurred was Four Corner Hustlers gang territory, but there were other gangs in the neighborhood as well. Alcantar said he did not know any of the people standing in front of the building to be members of the Four Corner Hustlers gang.

Richardson also testified on behalf of the state. Richardson said that on the day of the shooting Scott and some friends were at her apartment located at 107th Street and Langley Avenue. When Richardson and her friends walked Scott to the door, they told him to check his van because there were thieves in the neighborhood. Scott discovered that his hubcaps were missing, and Richardson saw him ask the group of people standing in front of the building if they

---

[1] Richardson's first name appears in the record variously as "Tamiko" and "Tamika," so the court will use the spelling adopted by the Illinois Appellate Court.

3

knew what happened to his hubcaps. Richardson saw Scott open the hood of his van, remove a handgun, and fire three shots into the air. Richardson did not hear any further gunfire.

On cross-examination, Richardson testified that one of the windows to her apartment was broken about two hours after the shooting. She also said that men in her neighborhood who were members of the Four Corners Hustlers gang told her she had to tell police the identity of the shooter.

Angela Jackson, another witness for the state, testified that she saw Scott open the hood of his van, pull a gun out of a brown paper bag, and shoot toward the crowd on the corner. Jackson then saw Scott's van pull up to the side of Woodrow's car, and heard two or three shots before the van pulled off toward 107th Street and Cottage Grove Avenue. She did not see anyone else with a gun or hear any other shots fired.

Shemika Coles testified for the defense. Coles said that ten to fifteen people were outside when she saw Scott lift the hood of his van and remove a small gun. Scott asked the crowd if anyone knew what happened to his hubcaps. No one responded, and Scott began firing shots into the air. Coles heard three shots and saw Scott put his van in reverse and leave.

Scott testified that he was at Richardson's home at 107th Street and Langley Avenue for about two and a half hours on Jan. 5, 1993. Richardson, Coles, and another woman walked Scott to his van because Richardson did not want anyone in her neighborhood to know that she and Scott were dating. Defense counsel attempted to ask Scott if he was affiliated with a gang, but the prosecutor objected on the basis of relevance, and the trial court judge sustained the objection.

Upon leaving Richardson's apartment, Scott heard whistling and saw two men running.

Richardson then told Scott that his hubcaps were missing, and Scott noticed that both of the door handles on his van were broken. Scott asked four men walking by if they had seen what happened to his van. Scott testified that they smirked and kept walking. Scott repeated the question. Richardson urged Scott to leave. As he got in his van, Scott heard two gunshots. Scott laid on the floor of his van, looked up and saw two men with guns running toward 107th Street on the sidewalk, approximately six to seven car lengths from his van. Scott then reached under his car seat, grabbed a .25-caliber automatic pistol, and fired it out of the driver's side window twice in the direction of 107th Street and Langley Avenue.

Scott testified that after he fired the first two shots, his gun jammed. He put his van in reverse and made a right turn on 107th Street heading westbound. Scott heard more gunshots as he entered the intersection. He saw a man in the alley behind Richardson's building fire a gun. Scott then drove home. Once there, he and his cousin inspected the gun and discovered that it had too much oil in it. Scott testified that his cousin took the gun to clean it, and denied telling his cousin to hide or destroy the gun. Later, Richardson told him that someone had been shot, and the police wanted to speak with him. Scott surrendered to police.

2.    Appeal and Subsequent Proceedings

Scott appealed his conviction, arguing that: (1) he was denied a fair trial by the trial court's rulings excluding testimony about gang affiliation, which prevented him from revealing the bias of certain witnesses; and (2) the evidence was insufficient to prove him guilty behind a reasonable doubt. The Illinois Appellate Court rejected these arguments and affirmed his conviction. (Direct Appeal, 7–9.) Scott did not file a petition for leave to appeal with the

Illinois Supreme Court or a petition for writ of certiorari to the U.S. Supreme Court. (Petition, 2.)

On Jan. 20, 1999, Scott filed a post-conviction petition in the Circuit Court of Cook County. (Dkt. No. 18, Ex. I, C37–C65 ("Post-Conviction Petition").) In that petition, Scott argued: (1) that his trial counsel was ineffective for (a) failing to impeach Tamiko Richardson; (b) failing to impeach Carlos Alcantar; (c) failing to investigate or interview any witnesses to the crime; (d) failing to interview and call Lawrence Jones ("Lawrence"), who would have testified that he and Alcantar were armed and fired at Scott; (e) failing to subpoena Janta Parsons, Steve Millet, and Arnold Romeo[2], all of whom would have corroborated Scott's version of events; and (f) providing Scott with poor representation because he and his family were unable to pay attorney's fees; (2) that Scott was convicted based on perjured testimony because a new affidavit from Lawrence contradicted the state's witnesses at trial; (3) that he was denied a fair trial by the trial court's rulings excluding testimony about the alleged gang affiliation of the victim, Scott, and key state witnesses; and (4) newly discovered evidence, contained in the Lawrence affidavit, indicated that Scott was actually innocent.

Attached to the Post-Conviction Petition was Lawrence's affidavit, in which Lawrence said he was the victim's brother and he and his brother were members of the Four Corner Hustlers gang. (Post-Conviction Petition, C66–C69.) Lawrence was present at the scene of the shooting, as were other members of the gang, including Parsons, Alcantar, and Marion Jones. (*Id.* at C66–67.) The latter two were Lawrence's cousins. (*Id.* at C67.) Lawrence was armed with a 9mm automatic handgun, and Alcantar with a Tech–9. (*Id.*) Scott was a member of a

---

[2] Millet and Romeo were attorneys who represented Scott prior to trial.

rival gang, and Richardson had a child by an incarcerated member of the Four Corner Hustlers gang. (*Id.*) After the shooting, Lawrence learned that members of the Four Corner Hustlers stole Scott's hubcaps because Scott was in a rival gang and was dating Richardson. (*Id.*)

Lawrence was in the alley next to Richardson's building and saw Scott walk to his van and confront a crowd of people about the missing hubcaps. (*Id.* at C67–68.) Lawrence then fired two shots at Scott, which missed. (*Id.* at C68.) Scott pulled out a black .25-caliber automatic handgun and fired over the heads of the people in the crowd. (*Id.*) Other members of the Four Corner Hustlers, including Alcantar, began firing at Scott, who jumped in his van and drove away, passing Woodrow's car as he did. (*Id.*) After Scott left, gang members continued firing shots, one of which shattered the window of Woodrow's car. (*Id.*) Woodrow then drove the victim, Michael Jones, to the hospital. (*Id.*)

Lawrence and several other members of the Four Corner Hustlers cleaned up the crime scene, picking up spent shell casings that might connect them to the shooting. (*Id.* at C69.) Lawrence and the other gang members agreed to blame the shooting on Scott, and intimidated other witnesses, including Richardson, to implicate Scott. (*Id.*)

Also attached to the Post-Conviction Petition were affidavits from Scott and his mother, Irviner Scott. Scott's affidavit supported his ineffective assistance claims against his trial attorney. (*Id.* at C70–75.) It also recounted a 1998 meeting with Lawrence Jones, in prison, in which Lawrence admitted to Scott that he knew Scott did not kill his brother, and that his brother had probably been accidentally killed in the crossfire. (*Id.* at C74.) Irviner Scott's affidavit supported her son's claims of ineffective assistance and contended that Scott's trial counsel failed to properly investigate the case because he had not been paid. (*Id.* at C76–78.)

On Feb. 22, 1999, Cook County Circuit Judge Michael B. Bolan, who had presided over Scott's trial, found the issues raised in the petition were frivolous and dismissed it.  (*Id.* at C79–99.)  Scott appealed, and the Illinois Appellate Court granted him a limited remand in order to introduce new affidavits from three witnesses, including Tamiko Richardson.  (Dkt. No. 18, Ex. J, C41 ("Limited Remand Order").)  The trial court appointed counsel, and the case remained pending for several years.  Because of the delay, Scott filed a request for a supervisory order from the Illinois Supreme Court, which was denied.  (Dkt. No. 18, Ex. O ("Order Denying Supervisory Order.").

While his Post-Conviction petition was pending, Scott also filed two habeas petitions in this court that were dismissed for failure to exhaust his state court remedies.  *See United States ex rel. Scott v. Firkus*, No. 05 C 5435, Dkt. No. 11; *Scott v. Stoudt*, No. 07 C 4545, Dkt. No. 15.  Also while his Post-Conviction Petition was pending, on Sept. 1, 2006, Scott filed in the Circuit Court of Cook County a petition for relief from judgment pursuant to 735 ILCS 5/2-1401.  (Dkt. No. 18, Ex. P ("Petition for Relief from Judgment.").)  In that petition, Scott alleged, in relevant part: (1) that he was denied a fair and impartial trial because of mistakes by the trial judge; (2) that the prosecutors made statements not supported by the evidence; (3) that trial counsel was ineffective for failing to make objections, file motions to suppress, and cross-examine witnesses; (4) the prosecution and the police conspired to frame him, and Scott's attorney did nothing about it because he wanted more money from Scott; (5) the prosecution knowingly presented perjured testimony at trial; (6) the judge misread the record when finding him guilty; and (7) trial counsel was ineffective for stipulating that a firearms expert would have testified that two bullet fragments of an unknown caliber were recovered from Jones' head.  (Petition for Relief from

8

Judgment, C43–C56.)  The trial court re-characterized this as a petition for post-conviction relief.

On Oct. 27, 2006, during a hearing, Scott attempted to file another document in an effort to amend his post-conviction petition.  (Dkt. No. 18, Ex. R, FF3.)  That document apparently was lost and did not appear in the record on state post-conviction review, although Scott has appended a file-stamped copy to his reply.  (Dkt. No. 22 ("Leave to File Amened (sic) Post-Conviction Petition").)  On Dec. 4, 2006, the trial court denied Scott leave to file the pro se amended post-conviction petition.  (Dkt. No. 18, Ex. R, GG4.)  Then, on Nov. 27, 2007, the trial court dismissed all of petitioner's still pending post-conviction petitions.  (Dkt. No. 18, Ex. S, F1–F12.)

Scott appealed both the denial of his Post-Conviction petition and the order denying him leave to a pro se amended post-conviction petition.  As noted, the pro se amended petition apparently could not be found at the time, and Scott's attorney concluded that his appeal could be filed without it.  (Dkt. No. 18, Ex. T, at 4 n.2 ("Brief in Second Appeal on Post-Conviction Review").)  In his appellate brief, Scott argued: (1) the circuit court erred in failing to hold an evidentiary hearing because his initial Post-Conviction petition, particularly Lawrence's affidavit, made a substantial showing of actual innocence; (2) newly discovered evidence, including Lawrence's affidavit, showed that the trial court's rulings excluding evidence of gang affiliation denied him the right to present a defense and confront the witnesses against him; and (3) he made a substantial showing that his trial counsel was ineffective for failing to investigate and interview Lawrence prior to trial.  (Brief in Second Appeal on Post-Conviction Review, 13–36.)

The Illinois Appellate Court affirmed the trial court's denial of post-conviction relief. (Dkt. No. 18, Ex. B. (*People v. Scott*, No. 1-07-0132 and 1-07-3483, consol., (Ill. App. Ct. Nov. 9, 2009) (unpublished order pursuant to Illinois Supreme Court Rule 23) ("Post-Conviction Appeal.")) The appeals court held that Scott had not been diligent in securing Lawrence's affidavit, and that while Lawrence's testimony might have strengthened Scott's case at trial, it did not show he was actually innocent. (Post-Conviction Appeal, 12–17.) Additionally, the appeals court rejected Scott's claim that the trial judge wrongly excluded gang affiliation testimony based on res judicata because that claim had been rejected on direct appeal. (*Id.* at 17–18.) Finally, the appeals court found that trial counsel's decision not to interview Lawrence did not amount to ineffective assistance because there was no reason for trial counsel to think that Lawrence, the victim's brother, would have provided evidence helpful to Scott. (*Id.* at 19–20.) The appeals court held that Scott waived any claim of error based on the denial of his motion to file an amended pro se post-conviction petition when he failed to include that petition in the record on appeal. (*Id.* at 20–21.)

Scott filed a pro se petition for leave to appeal this ruling to the Illinois Supreme Court, which raised three issues. (Dkt. No. 18, Ex. X ("Pro Se Petition for Leave to Appeal.").) Scott argued: (1) the appeals court erred in finding that he did not show due diligence in securing Lawrence's affidavit and that Lawrence's testimony would not have changed the result of the trial; (2) trial counsel was ineffective for failing to interview Lawrence prior to trial; and (3) his post-conviction appellate counsel was ineffective for failing to argue that the trial court erred in denying his attempt to file an amended pro se post-conviction petition. (Pro Se Petition for Leave to Appeal, 3.) Scott's Pro Se Petition for Leave to Appeal was denied. (Dkt. No. 18, Ex

Y.)  He did not file a petition for writ of certiorari with the U.S. Supreme Court.

3.      Proceedings Before this Court

Before turning to the substance of Scott's claims, the court must clarify precisely what claims are at issue here.  As stated above, Scott filed his original habeas petition with this court on Aug. 18, 2010.  Scott apparently misconstrued this court's order setting a briefing schedule in the case, and on Nov. 5, 2010, he filed what he titled "Petitioner's Answer to Petition for Writ of Habeas Corpus."  (Dkt. No. 19 ("Amended Petition").)  Scott's "answer" was filed prior to the Respondent[3] having filed his answer to his original petition, but did not appear on the docket until Nov. 9, 2010.  In the meantime, Respondent filed his answer to the original petition.

As this court noted in its Nov. 30, 2010 order construing Scott's "answer" as a motion to amend his habeas petition, this "answer" for the most part re-iterated claims in Scott's original petition, but also added new claims.  (Dkt. No. 20.)  The court allowed Respondent to respond to the motion to amend, and set a date for Scott to reply.  (*Id.*)  Respondent did not object to the amendment, but argued that Scott had waived his claim that the prosecution presented false testimony at his trial by not raising it in the amended petition.  Upon careful review of the Petition and the Amended Petition, the court finds that Scott's claim in both instances was that prosecutors mischaracterized the testimony of witnesses, particularly Angela Jackson, in their opening statement, not that they presented perjured testimony.  (Compare Petition at 4, Amended Petition at 8.)

Regardless, the differences between the petitions are irrelevant.  As previously stated, Respondent answered Scott's original petition prior to the Amended Petition being docketed.

---

[3]Although Scott's Petition lists the respondent as Gregory Firkus, acting  warden of Logan Correctional Center, Scott is now on parole.  Jesse Montgomery, Chief of the Parole Division for the Illinois Department of Corrections, is substituted as the respondent in this action.

Scott then filed his reply to that answer, in which he indicated he did not intend to file an Amended Petition and wished to proceed on his original petition. (Pet'r's Reply, 2.) Given that, the court's finds that Scott's Amended Petition is withdrawn, and will rule on the claims in his original petition, which have been fully briefed.

## LEGAL STANDARD

Habeas relief under 28 U.S.C. § 2254 is limited by a variety of procedural requirements. State prisoners cannot present a claim in federal court until they exhaust their state court remedies by fairly presenting their federal claims to the state courts. *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008). This requires the petitioner to present "'both the operative facts and the controlling legal principles'" to the state court. *Id.* (quoting *Williams v. Washington*, 59 F.3d 673, 677 (7th Cir. 1995)). Fair presentment also requires that the petitioner assert his federal claim through one complete round of state court review, either on direct appeal or during post-conviction proceedings. *Malone*, 538 F.3d at 753. A claim is procedurally defaulted if a habeas petitioner exhausts his state court remedies without properly asserting his federal claim at each level of state court review. *Id.*

A petitioner may present a procedurally defaulted claim if he shows: (a) adequate cause for the default and prejudice from losing review on the merits, or (b) that a fundamental miscarriage of justice will result from the lack of review. *Smith v. McKee,* 598 F.3d 374, 382 (7th Cir. 2010). Cause requires an objective factor (external to the defense) that prevented a petitioner from presenting the claim earlier; prejudice means that error "so infected the entire trial that the resulting conviction violates due process." *Id.* (internal citations omitted).

If the state court adjudicated a claim on the merits, habeas relief is only available if that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if the decision was based upon "an unreasonable determination of the facts in light of the evidence presented [to that court]." 28 U.S.C. § 2254(d)(1), (2). The court will address each of Scott's claims in turn.

## ANALYSIS

1.   Claims that Are Not Cognizable

Federal courts may grant habeas relief only for violations of the federal Constitution, laws, or treaties. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see* 28 U.S.C. § 2254(a). Habeas relief is not available to remedy errors of state law. *Id.*

Ground two of the Scott's Petition is labeled "Newly Discovered Evidence," but, based on a fair reading of Scott's petition and reply, is a claim that his post-conviction counsel was ineffective.[4] In that claim, Scott asserts that a witness named Shermarie Barnes signed an affidavit on July 22, 2005, averring that he saw Lawrence and Alcantar picking up bullet cartridges at the scene of the shooting on Jan. 5, 1993. (Petition, 3–4.) This information, Scott argues, was not known to him at trial, but was given to the public defender who represented him on post-conviction review. (*Id.* at 4.) That attorney failed to amend the post-conviction petition to reflect this evidence. (*Id.*) However, even if Scott's post-conviction counsel was ineffective, there is no federal constitutional right to effective counsel (or any counsel) during post-conviction proceedings. *Pitsonbarger v. Gramley*, 141 F.3d 728, 737 (7th Cir. 1998) (citing

---

[4] To the extent Scott is attempting through this claim to assert a free-standing claim of actual innocence based on newly discovered evidence, the Supreme Court has indicated that to the extent such claims are cognizable, the threshold to make such a showing is "extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1990). As will be discussed herein, Scott has not made such a showing.

*Coleman v. Thompson,* 501 U.S. 722, 756–57 (1991)).  So this claim is not cognizable.

In his fourth ground for relief, Scott alleges that his trial counsel was ineffective.  He points to the fact that the Illinois Attorney Registration and Disciplinary Commission suspended his trial counsel on Dec. 9, 2008, for ineffective assistance of counsel and mishandling of unrelated cases.  However, unlike his ineffective assistance claim in his first ground for relief, Scott points to no specific acts or omissions of this trial counsel that affected the outcome of his trial.  While it is clear that Scott's trial counsel had "shortcomings . . . in his general practice of law," this court must apply the principles of *Strickland v. Washington*, 466 U.S. 668 (1984), to determine whether he was ineffective in handling Scott's defense.  *Berkey v. United States*, 318 F.3d 768, 774 (7th Cir. 2003).  *Strickland* requires more than a general complaint about a lawyer's competency; it requires a showing of specific acts or omissions that were outside the range of professionally competent assistance, and which prejudiced Scott.  *Id.* at 772; *Cf. U.S. ex rel. Ferguson v. Chambers*, No. 04 C 6417, 2005 WL 1311368, at *5 (N.D. Ill. May 31, 2005) (holding that trial counsel's disciplinary action in an unrelated case did not support petitioner's claim of actual innocence).  Because Scott's fourth ground for relief alleges no specific errors or omissions that occurred during the pendency of Scott's case, it is not cognizable.

2.    Claims that Are Procedurally Defaulted

Scott's first ground for relief is ineffective assistance of counsel, but Scott raises three separate factual bases for the claim.  He alleges trial counsel was ineffective for: (1) failing to interview witnesses, particularly Lawrence Jones; (2) stipulating to testimony that the bullet that killed the victim traveled in a horizontal plane without attempting to show that it would have been impossible for the bullet to travel horizontally if Scott fired shots from his van as the state

14

alleged; and (3) failing to introduce evidence that two bullets were recovered from the victim's head, despite the fact that the caliber of the second bullet was unknown, which would have cast doubt on the state's theory that Scott was the sole shooter.[5]

A claim of ineffective assistance is a single claim, no matter how many deficiencies are alleged in support of it. *U.S. ex rel. Carroll v. Hathaway*, No. 10 C 3862, 2012 WL 171322, at *5 (N.D. Ill. Jan. 19, 2012) (citing *Stevens v. McBride,* 489 F.3d 883, 894 (7th Cir. 2007)). However, because a petitioner is obligated to present the state court with both the facts and law underlying his claim, he can default individual bases for an ineffective assistance claim. *Id.*

The court finds, and Respondent agrees, that the claim as to trial counsel's failure to interview Lawrence Jones was fully and fairly presented to the state courts during post-conviction review. Respondent argues, however, that Scott's claims as to the ballistics issues were not subject to a complete round of appellate review as required. Scott's re-characterized Petition for Relief from Judgment includes the ballistics issues, or at least the argument that trial counsel should have questioned the state's firearms expert about the existence of additional, unidentified bullet fragments. (Petition for Relief from Judgment, at C51–52.) Yet Scott's brief on appeal, in which counsel represented him, did not raise these issue. (Brief on Post-Conviction Review, 13–36.) His pro se petition for leave to appeal touched upon the issue of the bullet fragments in the barest possible way. In reference to his argument that trial counsel was ineffective for failing to interview Lawrence, Scott argued that Lawrence's affidavit would have

---

[5] Scott's argument that two bullets were recovered from the victim's head is imprecise. A review of the trial transcript indicates that the parties stipulated that the state's firearms expert would have testified that he examined a bullet recovered from the victim's head and determined it to be from a 9mm handgun. He also would have testified that he examined two additional metal fragments recovered from the victim's skull and they were not suitable for comparison. (Dkt. No. 18, Ex. C ("Trial Transcript," 81–82).) At any rate, Scott's argument appears to be that by questioning the firearms expert, his trial counsel could have elicited helpful testimony that there may have been more than one shooter at the scene.

contradicted the state's theory of "'no shooter except defendant and sheds light on the unidentified bullet retrieved from the skull of the victim.'" (Pro Se Petition for Leave to Appeal, 2.) Regardless, the ballistics claims were not raised before the appeals court, so they were not raised in a complete round of state court review, and are procedurally defaulted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999).

Additionally, Scott's third ground for relief, that prosecutorial misconduct occurred when prosecutors made misstatements about what the evidence would show, also is procedurally defaulted. Scott raised this issue, at least as to Angela Jackson's testimony, in his re-characterized Petition for Relief from Judgment, arguing that prosecutors in their opening statement said that Jackson would testify that she saw Scott reach out of the van point the gun at Woodrow's vehicle, and fire. (Petition for Relief from Judgment, C53.) In actuality, Jackson testified that she saw Scott's van pull up to Woodrow's car and heard shots being fired, but did not see the gun or Scott shooting at the car. (Trial Transcript, 74–75.) But Scott did not raise the issue in his post-conviction appeal brief or his petition for leave to appeal the dismissal of his post-conviction petitions.[6] More importantly, the court cannot see how this misstatement amounts to a violation of Scott's federal constitutional rights. Opening statements provide an overview of what the prosecution expects the evidence will show, but the actual testimony often varies through no fault of the prosecutors. *Cf. Albro v. United States*, No. 09 CV 153, 2010 WL 3364205, at *5 (E.D. Tex. July 26, 2010) (finding habeas petitioner did not state a claim for ineffective assistance of counsel based on counsel's failure to object to erroneous opening statement).

---

[6] In his habeas petition, Scott also claims that prosecutors mischaracterized Richardson's testimony, but this claim also was not subjected to a complete round of state court review, and is procedurally defaulted.

In order to proceed on his procedurally defaulted claims in relation to trial counsel's alleged failure to explore the ballistics evidence, Scott must satisfy either the cause-and-prejudice test or show that a fundamental miscarriage of justice will result from the lack of review. *McKee,* 598 F.3d at 382. Cause requires an objective factor (external to the defense) that prevented a petitioner from presenting the claim earlier; prejudice means that error "so infected the entire trial that the resulting conviction violates due process." *Id.*

Scott focuses his efforts to show cause to excuse his procedural default on the pro se motion he filed in Cook County Circuit Court on Oct. 24, 2006, to amend his post-conviction petition. As noted above, that motion was denied, and then apparently lost from the record, but Scott has produced a copy appended to his reply. (Dkt. No. 22 ("Leave to File Amened (sic) Post-Conviction Petition.")) In it, Scott said: (1) that he had obtained additional affidavits supporting his claim of innocence from witnesses who recanted their trial testimony, and those who were not called to testify at trial; (2) that he wanted to raise an additional claim of ineffective assistance against trial counsel for failure "to obtain essential testimony from available witnesses who have provided Affidavits for Petitioner;" (3) he wanted to raise a claim of ineffective assistance on direct appeal "for not raising any issues that are in this petition that could have been raised on direct appeal;" and (4) a claim of plain error against the trial judge for considering facts in his finding of guilty that were not supported by the trial testimony. (*Id.*)

As a preliminary matter, the issues related to ballistics evidence that Scott is attempting to raise in this court do not appear in his motion to amend, which only vaguely describes the new claims he wanted to make. It is not clear how the denial of Scott's motion to amend affected the procedural default at issue here. Scott's real complaint seems to be that his post-conviction

counsel failed to amend his petition to include an affidavit from Shermarie Barnes, who allegedly attested to having seen Lawrence, Alcantar, and other gang members picking up empty shell casings from the scene of the crime. (Pet'r's Reply, 3.) Scott's pro se motion to amend does not mention Barnes by name, however, or describe the evidence Barnes would have provided. Further, even assuming that Scott's post-conviction counsel was ineffective for failing to amend the petition to include Barnes' affidavit, this claim is not cognizable on habeas review for the reasons explained above.

To the extent Scott is attempting to argue that Barnes' affidavit, as well as affidavits from Lawrence, Richardson, and Jackson, support a claim of actual innocence, either to excuse his default or as a freestanding claim, this argument falls short. Scott cites the correct standard to demonstrate innocence in a collateral proceeding in order to excuse a procedural default. (Pet'r's Reply, 3.) A petitioner must present "new reliable evidence that was not presented at trial" and "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Balsewicz v. Kingston*, 425 F.3d 1029, 1033 (7th Cir. 2005) (quoting *Schlup v. Delo,* 513 U.S. 298, 299 (1995)). To reach this threshold requires "documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs and phone logs to back up the claim. *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).

Petitioner relies on the affidavits of Lawrence, Barnes, Richardson, and Jackson. As explained above, Lawrence averred that Scott had fled the scene before Jones was shot and that Jones was likely killed accidentally in the crossfire of shots between members of the Four Corner Hustlers gang members. This court has been unable to locate the affidavits of

Richardson and Jackson in the state court record, but Scott attached copies to his "answer."[7] (Dkt. No. 19.)  In her affidavit, dated June 24, 1999, Richardson averred that she only saw Scott fire his gun in the air before leaving the scene of the shooting, and that Lawrence threatened her with physical harm if she did not implicate Scott in the murder.  Jackson similarly averred in a July 1, 1999, affidavit that she while she saw Scott fire shots in the air, she never saw Scott fire a gun into Woodrow's car or stop next to it.  Attached to Scott's "answer" and his reply are affidavits from Barnes.

In an affidavit dated July 22, 2005, Barnes averred that on the day of the shooting, he saw Jones and Alcantar picking up bullet cartridges at the scene of the shooting.  Attached to Scott's reply is correspondence from the assistant public defender who represented him on post-conviction review.  The assistant public defender sent a letter to Barnes dated Aug. 30, 2005 in which she asked Barnes, then incarcerated at Logan Correctional Center, to contact her about Scott's case.  She then sent a letter to Scott dated Sept. 1, 2005, in which she told Scott that Barnes had called her and stated that he did not sign an affidavit on Scott's behalf and did not know him.  Also attached to the reply is another affidavit, purportedly from Barnes and dated Sept. 28, 2005, in which Barnes avers that he received the attorney's letter on Aug. 30, 2005, but did not call her and did not deny making statements on behalf of Scott.  Barnes again asserted that he had seen Lawrence and Alcantar picking up bullet cartridges at the scene of the shooting.

The problem with the evidence that Scott has marshaled[8] is that while it would have

---

[7]  The record includes a letter from Scott's post-conviction counsel to Judge Bolan following the limited remand of his case, in which she details certain filings with the Circuit Court of Cook County, including the Richardson and Jackson affidavits.  (Dkt. 18, Ex. K, C49–50.  Scott's brief in his second appeal on post-conviction review also makes reference to the content of these affidavits (Brief on Second Appeal in Post-Conviction Review, 11.)

[8]  These affidavits are presented in piecemeal fashion before this court, but given Scott's status as a pro se litigant, the court will take into account the affidavits that were before the trial court on post-conviction review.

strengthened his defense at trial, it simply does not meet the high threshold required for a showing of actual innocence. It is not enough for Scott to show that the outcome of his trial might have been different with this testimony; he must show that it is more likely than not that no reasonable fact-finder would have convicted him. *Battaglia*, 403 F.3d at 938.

The Seventh Circuit has held that recantations of testimony, like that of Jones and Richardson, should be viewed skeptically because such recantations come outside of the formality of court proceedings, which encourage truthfulness. *Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000). Witnesses are susceptible to influence, as well as to harassment by defendants (or their associates) seeking to overturn the results at trial. *Id.* While Richardson averred that she was fearful of the gang members in her neighborhood, Scott admitted that he too was a gang member. The bottom line is that there may be many reasons why a witness tells a defendant what he wants to hear after trial. Trial testimony is inherently more reliable. Although it doesn't involve a recantation of trial testimony, the back-and-forth over the Barnes affidavit illustrates this problem as well. Barnes allegedly produced a statement on Scott's behalf, Scott's lawyer told him that Barnes denied making that statement, and Scott then produced another out-of-court statement purportedly from Barnes in which Barnes denied talking to the lawyer and said she lied about his refusal to provide a statement on behalf of Scott. The reliability of these affidavits is questionable at best.

More importantly, in light of the testimony of Woodrow Jones and Carlos Alcantar, this court cannot find that no reasonable jury would have been convicted Scott had this evidence been available at the time of trial. Woodrow, in particular, gave credible testimony identifying Scott as the shooter that he has never recanted, and upon which a fact-finder could have

reasonably relied in finding Scott guilty. *See Battaglia*, 403 F.3d at 938 ("It is black letter law that the testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar.") (internal citation omitted).

Because Scott has shown neither cause and prejudice nor actual innocence, he cannot pursue his procedurally defaulted claims as to his attorney's handling of the ballistics evidence.

3.      Scott's Ineffective Assistance of Counsel Claim

Scott has preserved his claim that trial counsel was ineffective for failing to interview Lawrence or call him to testify. In assessing this claim, this court looks to the decision of the last state court to consider the merits of the claim, which in this case is the Illinois Appellate Court's decision on post-conviction review. *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006). Habeas relief may be granted on this claim only if the state court decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (2). The Seventh Circuit has characterized these as "demanding standards." *Atkins v. Zenk*, --- F.3d ---, 2012 WL 272848, at *4 (7th Cir. Jan. 31, 2012). Habeas relief will not lie if the state court "took the constitutional standard 'seriously and produce[d] an answer within the range of defensible positions.'" *Id.* (quoting *Mendiola*, 224 F.3d at 591–92); *see Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2003) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case.").

As noted above, the clearly established federal law governing ineffective assistance claims is found in *Strickland*, 466 U.S. at 687, and requires Scott to show both that counsel's

performance was deficient, and that the deficient performance prejudiced the defense. The second prong requires a showing of a reasonable probability that but for the counsel's unprofessional errors, the result of the trial would have been different. *Id.* at 694. Making such a showing is difficult, given that counsel "'need not be perfect, indeed not even very good, to be constitutionally adequate.'" *McAfee v. Thurmer*, 589 F.3d 353, 355–56 (7th Cir. 2009) (quoting *Dean v. Young*, 777 F.2d 1239, 1245 (7th Cir. 1985)). This standard becomes even more difficult to meet in the context of a habeas case, given that only a clear error in applying *Strickland* will support a habeas claim. *McAfee*, 589 F.3d at 356.

The Illinois Appellate Court, in addressing this claim, applied the *Strickland* standard to find that trial counsel's decision not to interview Lawrence was neither objectively unreasonable nor prejudicial. Post-Conviction Appeal, at 19. The appeals court found that there was no reason for trial counsel to think that Lawrence would admit to having fired a weapon at the scene and potentially having killed his own brother. *Id.* at 19–20. The appeals court found it "prudent and reasonable" as a matter of trial strategy for trial counsel not to have attempted to interview Lawrence, particularly given the fact that Alcantar's and Richardson's grand jury testimony supported the state's case. *Id.* at 20.

In arguing this determination was unreasonable, Scott points to a letter from his trial counsel to the Illinois Attorney Registration and Disciplinary Commission that he appended to his reply. (Dkt. No. 22.) In it, in response to a complaint against him by Scott, trial counsel said he "would have loved to have known" the information Lawrence provided prior to trial. Scott also contends that trial counsel knew that Lawrence was incarcerated in the Cook County Jail at the time of trial. (Pet'r's Reply, 6–7.) However, even in his own affidavit in support of his Post-

Conviction petition, Scott maintains that Lawrence did not admit his culpability in the incident that killed his brother, and the subsequent alleged cover-up, until 1998, more than two years after Scott's trial.  (Post-Conviction Petition, C74.)  The Illinois Appellate Court's determination that trial counsel's decision not to interview Lawrence did not amount to ineffective assistance was not an unreasonable application of the *Strickland* test.  As such, Scott is not entitled to habeas relief on this basis, and his petition is denied in its entirety.

4.      Certificate of Appealability

Upon issuing an order denying habeas relief, this court must determine whether to issue a certificate of appealability for any of the claims.  *See* Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.  This requires that the applicant make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  If the claim is denied on the merits, the applicant must show that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong.  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  If the claim is denied on procedural grounds, the applicant must show that reasonable jurists would find it debatable whether the claim states the denial of a constitutional right, and that they would find the procedural ruling debatable as well.  *Id.*  Because the court finds that the relevant case law clearly compels the result reached here, the court declines to issue a certificate of appealability on any of Scott's grounds for relief.

CONCLUSION

For the reasons stated herein, Scott's petition for habeas relief is denied in its entirety, and the court declines to issue a certificate of appealability.  The Clerk is directed to substitute

Jesse Montgomery, Chief of the Parole Division for the Illinois Department of Corrections, as

the Respondent in this action.

ENTER:

_James F. Holderman_____

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date:   February 6, 2012